FILED

2014 Oct-09  PM 04:18
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **GLENN S. DAVIS, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 2:12-cv-01632-RDP** |
| | ) | |
| **BANK OF AMERICA, N.A., et al.** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION</u>**

In 2007 financial markets around the world seized up.  The United States suffered a major mortgage crisis which set off a dramatic chain reaction that adversely affected not only the housing market but brought about a broad range of financial chaos.  Borrowers lost their homes. Financial institutions failed.  As the public witnessed all of this, there was widespread panic.

In response to this mortgage crisis and economic recession, lenders were encouraged to offer loan modifications to assist struggling borrowers.  Loan modifications were originally intended to help well-intentioned borrowers remain in their homes through the mortgage crisis and enable them to make their loan payments.  However, a subset of borrowers made a discovery.  If they challenged a foreclosure -- even if they were undisputedly in default -- they could stay in their homes, often "rent-free," as their case made its way through the court system, a process which can take months, if not years. This trend enabled certain borrowers who were not qualified for a loan modification (and, in many cases, not interested in a loan modification or negotiating a settlement, but instead desired to live free until the foreclosure ran its course), to "game the system."  This case presents just such a troubling scenario.[1]

---

[1] And this is not the first rodeo for these Plaintiffs.  If it had proceeded, the foreclosure at issue in this case would have been Plaintiffs' fourth.  Also, this is the second case in which Plaintiffs have disputed the signatures on

Currently before the court is Defendants' Motions for Summary Judgment (Docs. # 69 and 71). The Motions have been fully briefed. (Docs. # 72, 74, 83 and 84). Upon the filing of Defendants' Motions for Summary Judgment, the court provided the pro se Plaintiffs a notice regarding their obligations in responding to the Motions and attached an explanation of Federal Rule of Civil Procedure 56. (Doc. # 76). Specifically, the court instructed Plaintiffs that "[t]he party opposing the motion must respond with counter affidavits and/or documents to set forth specific facts showing that there is a genuine issue of material fact to be litigated at trial." (Doc. # 76 at 1-2).

## I.      Undisputed Facts[2]

On or about April 6, 2005, Plaintiffs obtained a $366,300.00 mortgage loan from MIT Lending ("MIT") (the "Loan"). In connection with the Loan, Mr. Davis executed and delivered a Promissory Note to MIT (the "Note"). (Doc. # 70-1 ¶ 5; Doc. # 70-2 at p. 5). As security for the Note, Mr. Davis executed a mortgage in favor of MERS, as nominee for MIT (the "Mortgage"). (Doc. # 70-1 ¶ 6; Doc. # 70-3 at p. 15). Although Mrs. Davis's signature appears on the mortgage and is notarized, Plaintiffs deny she signed the document.

The closing occurred in Birmingham, and Mr. Davis testified that his wife did not attend. (Doc. # 75-3 at pp. 41-43, 51-52). Mr. Davis testified that he attended the closing, but signed the note and mortgage a couple of weeks after the closing. (Doc. # 75-3 at pp. 44-47). However, a notary sealed the mortgage document with both of the Davis's signatures on the date of the closing. (Docs. # 53-56). Mr. Davis admits that his intent at closing was to borrow money to

_____

a mortgage on property they purchased. (Doc. # 75-8 at pp. 29-37).

[2] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. All reasonable doubts about the facts have been resolved in favor of the nonmoving party. *See Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002). These are the "facts" for summary judgment purposes only. They may not be the actual facts that could be established through live testimony at trial. *See Cox v. Adm'r U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

pay for his house and he intended to sign the note and the mortgage in relation to that transaction.  (Doc. # 75-3 at pp. 48-52).

MIT endorsed the Note in blank and transferred the Note to Merrill Lynch Mortgage Lending, Inc. ("MLMI").  (Doc. # 70-1 ¶ 7; Doc. # 70-2).   Pursuant to a Pooling and Servicing Agreement ("PSA") dated September 1, 2005, MLMI deposited certain notes (including the Note at issue) into a Trust, for which JPMorgan Chase Bank, N.A. ("JPM") was Trustee.  (Doc. # 70-1 ¶ 8; Doc. # 77-1 at pp. 48-49; Doc. # 77-2).  The Bank of New York Mellon Trust Company, N.A. ("BONY") is Successor Custodian to JP Morgan Trust Company, N.A.  (Doc. # 70-1 ¶ 1). BONY's business records show that The Bank of New York Mellon Trust Company took possession of the original Note on May 6, 2005 and that the Note remained with the Trust until it was released to the servicer.  (Doc. # 70-1 ¶¶ 9-10; Docs. # 70-6 and 70-7).

By way of assignment, BONY is the current holder of the Mortgage.  (Doc. # 70-1 ¶ 11; Doc. # 70-8 at p. 1).  Bank of America, N.A. ("BANA") was the servicer of the Loan between March 1, 2010 and December 1, 2012.  During this two plus year period, BANA received nine payments from Plaintiffs, five of which were returned for insufficient funds.  (Doc. # 70-9 ¶ 9; Doc. # 70-14 at p. 1).

On May 12, 2010, BANA sent Plaintiffs a notice of default and notice of intent to accelerate, which stated the amount required to cure Plaintiffs' default.  (Doc. # 70-9 ¶ 10; Doc. # 70-15 at p. 1).  Plaintiffs did not cure the default.  The last regular monthly payment BANA received from Plaintiffs was in August 2010.  (Doc. # 70-9 ¶ 11; Doc. # 70-14 at p. 1).

Between May 12, 2010 and October 18, 2011, BANA engaged in loss mitigation efforts with Plaintiffs, including reviewing them for a potential loan modification.  (Doc. # 70-9 ¶ 12). Plaintiffs did not return all of the documents required for BANA to review them for a loan

modification.  For example, Plaintiffs did not include their tax returns, which they reported to BANA they had not filed since 2008.  (Doc. # 70-9 ¶ 12).  Therefore, BANA could not complete its review.

On October 18, 2011, BANA notified Plaintiffs in writing that it had accelerated their debt and that it would foreclose on the property at issue on December 1, 2011.  BANA also enclosed the Notice of Foreclosure Sale that was to be published in the Alabama Messenger. (Doc. # 70-9 ¶ 13; Doc. # 70-16 at p. 3).   The foreclosure sale was continued multiple times, and no sale has ever been conducted.  (Doc. # 70-9 ¶ 13).

After receiving the foreclosure notice, Mr. Davis sent a letter to BANA dated November 14, 2011 requesting information about the Loan.  (Doc. # 70-9 ¶ 14; Doc. # 73-1 at pp. 1-2). BANA received Mr. Davis's letter on November 18, 2011.  (Doc. # 70-9 ¶ 14).  BANA mailed an acknowledgement letter to Mr. Davis on December 19, 2011 and BANA's attorney mailed a response letter to Mr. Davis on February 14, 2012.  (Doc. # 70-9 ¶ 14; Doc. # 73-1 at pp. 3-5).

Mr. Davis sent BANA a second letter dated February 14, 2012 requesting information about the Loan.  (Doc. # 70-9 ¶ 15; Doc. # 73-2 at pp. 1-6).  BANA received Mr. Davis's second letter on February 20, 2012.  (Doc. # 70-9 ¶ 15).  BANA mailed an acknowledgement letter to Mr. Davis on February 29, 2012, and BANA's attorney mailed a response letter to Mr. Davis on March 1, 2012. (Doc. # 70-9 ¶ 14; Doc. # 73-2 at pp. 7-11).

Two weeks after Mr. Davis sent his second letter to BANA, Plaintiffs filed a Complaint against BANA and BONY in the Circuit Court of Shelby County, Civil Action No. 2012-110. (Doc. # 73-3).  On April 20, 2012, BANA and BONY removed this case to this court.  Doc. # 1).

After Plaintiffs filed their initial Complaint, BANA again began a review of Plaintiffs for a loan modification. (Doc. # 70-9 ¶ 16). BANA voluntarily ceased all foreclosure activities with respect to Plaintiffs' loan on October 12, 2012. (Doc. # 70-9 ¶ 19).

On December 1, 2012, the servicing of the Loan transferred to Select Portfolio Servicing, Inc. ("SPS"), which continued to review Plaintiffs for a loan modification. (Doc. # 70-9 ¶ 16). After the Loan transferred to SPS, BANA continued to forward financial documents received from Plaintiffs to SPS for its review. (Doc. # 70-9 ¶ 16).

Plaintiffs' mortgage payments were, at all times, properly credited according to the terms of the Note and Mortgage, and any fees and/or late charges incurred were authorized according to the terms of the Note and Mortgage. (Doc. # 70-9 ¶ 17). As of December 1, 2012, the unpaid principal balance on the Loan was $349,206.61; the escrow deficiency (due to advances BANA made for property taxes and hazard insurance) was $10,216.35; the total late charges were $595.70; and the total fees owed were $11,351.98. (Doc. # 70-9 ¶ 18; Doc. # 75-1 at ¶ 17).

Plaintiffs' lawsuit against BANA was pending at the time servicing rights transferred to SPS. SPS voluntarily agreed to (1) maintain a stay of foreclosure proceedings and (2) resume the loan modification review initiated by BANA. (Doc. # 75-1 ¶ 5).

Beginning in January 2013, the court stayed the case to enable the parties to renew their attempts to obtain a loan modification for Plaintiffs. (Doc. # 15). Since at least February 18, 2013, and during their prior attempts at loan modification, Plaintiffs were aware that copies of their tax returns for the previous years, with all relevant schedules, would be required to establish Plaintiffs' income and obtain a loan modification. (Doc. # 70-9 at ¶ 12; Doc. # 16).

On March 29, 2013, SPS wrote a letter to Mr. Davis informing him that his loan did not qualify for a modification under the Home Affordable Modification Program ("HAMP"). The

letter also informed Mr. Davis that he had thirty (30) days to dispute the denial and set forth detailed instructions for submitting an appeal. (Doc. # 75-1 ¶ 4; Doc. # 75-1 at pp. 39-45).

On Sunday, April 28, 2013, the date the appeal period expired, Mr. Davis submitted an "appeal" to SPS's legal counsel consisting solely of a "Birmingham Area MLS – Shelby County Tax Report" with no explanation.  (Doc. # 75-10).  Mr. Davis was informed that, in order to pursue an appeal, he was required to follow the express procedures set forth in the March 29, 2013 letter, including the requirement that the appeal be submitted directly to the address/department identified in the denial letter.  (Doc. # 75-10).

On June 14, 2013, SPS wrote a letter to Mr. Davis offering to review his loan for a modification pursuant to SPS's proprietary loan modification program.  The letter advised Mr. Davis that, in order to be considered for such a modification, he would need to: (1) complete and submit an RMA form, (2) submit a signed and dated IRS Form 4506T-EZ, provide documentation of income (most recent federal income tax return with all schedules, two most recent pay stubs, and quarterly or year to date profit and loss statements if self-employed).  The necessary forms were enclosed with the letter.  (Doc. # 71-1 ¶ 10; Doc. # 75-2 at pp. 3-13).

 On July 18, 2013, SPS sent Plaintiffs an "URGENT – FINAL NOTICE" letter stating that SPS needed certain previously requested documents by August 2, 2013, including the federal tax return for the previous year for each borrower, to process Plaintiffs' request for a loan modification.  (Doc. # 25).  However, on July 24, 2013, Plaintiffs represented to the court that they had not yet even filed their 2012 tax returns.

On August 28, 2013, SPS received an email from Mr. Davis containing some, but not all, of the documentation originally requested on June 14, 2013.  (Doc. # 75-1 ¶ 13; Doc. # 75-2 at p. 24).

As of September 12, 2013, the following documents were missing from the Davis's loan modification package: (a) Current Hardship Explanation Letter (Letter provided was dated December 1, 2012); (b) The RMA form provided was missing a page with terms and conditions; (c) Current Homeowner's Association Statement; (d) Paystubs within the past 90 days (Mr. Davis reported that he did not receive a paystub for the month of August); (e) Bank Statements within the past 90 days (Mr. Davis reported that he did not have any bank accounts); and (f) Profit and Loss Statements from January 2013 to August 2013. (Doc. # 75-1 ¶ 14; Doc. # 75-2 at pp. 23-25).

Mr. Davis informed SPS that he would e-mail the missing documents to SPS "tomorrow" – *i.e.*, on September 13, 2013.  (Doc. # 75-2 at p. 23).  Because SPS did not receive the missing documents on September 13, 2013, SPS telephoned Mr. Davis on September 14, September 16 and September 18, 2013, to follow up on the status of the missing documents but could not make contact with him.  SPS did not receive any return calls, documents, correspondence, or any other communication from Mr. Davis after September 12, 2013.  (Doc. # 75-1 ¶ 15; Doc. # 75-2 at p. 23).

In his deposition, Mr. Davis admitted that he never sent in the information/documentation as he promised to do on September 12, 2013.  Mr. Davis testified as follows:

> Q.    Did you ever send it in, another [RMA hardship explanation] letter?
>
> A.    Nope.
>
> Q.    Why not?
>
> A.    Because I understood the court's order that nothing precluded us from doing this right here but proceed with litigation.  And what the issues that was happening, the way things was going, it was futile.  I sent in over and over and over again.  It wasn't a big concern of mine at the time because I didn't think you guys were ever going to do it.

(Doc. # 75-3 at pp. 151-52).

On October 15, 2013, Plaintiffs filed their Amended Complaint which added SPS as a defendant in this case.  (Doc. # 35).

On November 18, 2013, SPS wrote to Mr. Davis to advise him that his request for a loan modification had been denied for failure to supply the required documentation.  (Doc. # 75-1 ¶ 16; Doc. # 75-1 at pp. 32-34).

SPS never received a mortgage payment from the Davises.  (Doc. # 75-1 ¶ 17).

As of March 31, 2014, (1) the unpaid principal balance on the loan was $349,206.61; (2) the escrow deficiency (due to advances made for the payment of property taxes and hazard insurance) was $18,455.58; (3) the total late charges were $595.70 (assessed by BANA); (4) the total fees owed were $11,351.98 (accessed by BANA); and (5) past due interest from July 1, 2010 in excess of $118,000.00 for failure to make monthly mortgage payments.  (Doc. # 75-1 ¶ 17).

On April 1, 2014, servicing of Plaintiffs' loan transferred from SPS to NationStar Mortgage.  (Doc. # 75-1 ¶ 19; Doc. # 75-2 at 36-38).

## II.    Standard of Review

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex*,

477 U.S. at 323.  Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings and -- by pointing to affidavits, or depositions, answers to interrogatories, and/or admissions on file -- designate specific facts showing that there is a genuine issue for trial. *See id*. at 324.

The substantive law will identify which facts are material and which are irrelevant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* 249.

When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Gargiulo v. G.M. Sales, Inc*., 131 F.3d 995, 999 (11th Cir. 1997).  As *Anderson v. Liberty Lobby, Inc*. teaches, Rule 56(c) "does not allow the plaintiff to simply rest on his allegations made in the complaint; instead, as the party bearing the burden of proof of trial, he must come forward with at least some evidence to support each element essential to his case at trial." *Anderson*, 477 U.S. at 252. "Mere allegations" made by plaintiffs are insufficient.  *Id.*

Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. "Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." *Sawyer v. Southwest Airlines Co*., 243 F. Supp.2d 1257, 1262 (D.Kan. 2003) (citing *Anderson v.*

*Liberty Lobby, Inc.*, 477 U.S. at 250-51).

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so onesided that one party must prevail as a matter of law.'" *Sawyer*, 243 F. Supp.2d at 1262 (quoting *Anderson*, 477 U.S. at 251-52); *see also LaRoche v. Denny's, Inc*., 62 F. Supp.2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear ... that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").

## III.     Analysis

Plaintiffs' First Amended Complaint contains the following claims: (1) Count One alleges BANA violated the Real Estate Settlement Procedures Act ("RESPA") by failing to timely respond to purported qualified written requests ("QWRs"); (2) Count Two alleges BANA "deceived" Plaintiffs by purporting to review Plaintiffs' loan for a modification after the mortgage/note had been sold, (3) Count Three alleges that SPS has "been misleading" Plaintiffs by "dual tracking" their account by purporting to review Plaintiffs' loan for modification while continuing foreclosure proceedings; (4) Count Four, in which Plaintiffs make assertions disputing the validity of the mortgage and note at issue relating to their home at 919 Highland Lakes Lane; (5) Count Five, in which Plaintiffs assert payments were not applied properly, and unauthorized charges have been added, to their outstanding balance on the mortgage/note; (6) Count Six, in which Plaintiffs assert Defendants fraudulently represented they were reviewing Plaintiffs' loan for modification; and (7) Count Seven which requests an injunction against unspecified conduct by Defendants.  (Doc. # 35).  The court addresses these claims below.

## A.      Count One – Plaintiffs Failed to Establish a RESPA Claim

To establish a claim for a violation of § 2605(e), Plaintiffs must present evidence that (1) BANA was a loan servicer; (2) BANA was sent a valid QWR; (3) BANA failed to adequately respond within sixty days; and (4) actual damages or an entitlement to statutory damages. 12 U.S.C. § 2605(e)(1)(A) & (2); *Frazile v. EMC Mortg. Corp.*, 382 Fed.Appx. 833, 836 (11th Cir. 2010).

### 1.      Plaintiffs' Letters Are Not QWRs Under RESPA.

First, Plaintiffs' letters are not "QWRs" because they seek information that is beyond the scope of RESPA.  Under RESPA, a QWR must pertain to the ***servicing*** of a loan.  *See* 12 U.S.C. § 2605(e) ("[I]f any servicer . . . receives a qualified written request from the borrower . . . for information relating to the ***servicing*** of such loan, the servicer shall provide a written response acknowledging receipt of the correspondence within 20 days (excluding legal public holidays, Saturdays, and Sundays) . . . .") (emphasis added); *see also Sirote v. BBVA Compass Bank*, 857 F. Supp. 2d 1213, 1221 (N.D. Ala. 2010) ("The problem is that it is not clear how any of the requested information actually relates to the servicing of any of plaintiff's accounts, as required by RESPA."); *Gates v. Wachovia Mortgage*, FSB, 2010 WL 2606511, at *3 (E.D. Cal. 2010) ("Courts routinely interpret section 2605 as requiring a QWR to relate to the *servicing* of a loan, rather than the *creation or modification* of a loan.")

Plaintiffs' letters in this case seek information that does not relate in any way to the servicing of the loan.  In the November 14, 2011 letter, Plaintiffs request "a copy of the original signed mortgage (promissory note)," and "any and all documents showing that [BANA is] the true owner of said note and any documentation that gives [BANA] the legal authority to foreclose on said property."  *(Doc. # 73-1 at p. 1).*  In the February 14, 2012 letter, Plaintiffs

request that their foreclosure sale be postponed "until such time that [BANA] has produced all previous and presently requested documents that is due us by LAW and demonstrate legal standing to foreclosure"; a copy of "any and all assignments illustrating how [BANA] became the holder of the note and mortgage"; "the full name, address and phone number of the current holder of this debt including the name, address and phone number of any trustee or other fiduciary"; a copy of "any mortgage Pooling and Servicing Agreement and all Disclosure Statements provided to any Investors with respect to any mortgage-backed security trust or other special purpose vehicle"; a copy of "the Prospectus offered to investors in the trust"; and the list goes on.  (Doc. # 73-2 at pp. 1-6). Because Plaintiffs' requests to BANA for information did not relate to the servicing of their loan, Plaintiffs have failed to establish the first element of their RESPA claim.

## 2.    BANA Responded in a Timely Manner.

Even if Plaintiffs' letters were in fact QWRs (and, to be clear, they were not), Plaintiffs' RESPA claim still fails because BANA responded in a timely manner under the statute and provided documents related to the servicing of the loan.

At the time of Plaintiffs' letters,[3] RESPA mandated that a servicer acknowledge a QWR within 20 days of receipt, and to either correct a borrower's records or otherwise respond to the QWR within 60 days.   These time requirements expressly exclude *legal public holidays, Saturdays and Sundays*.  *See* 12 U.S.C. § 2605(e)(1)(A), (1)(B)(2).

The undisputed evidence shows that BANA received Plaintiffs' November 14, 2011 letter on November 18, 2011, acknowledged the letter on December 19, 2011 (20 business days after receipt, excluding legal public holidays), and responded to the letter on February 14, 2012 (58

---

[3] Section 2605(e) was recently amended to provide for shorter response periods for servicers.

business days after receipt, excluding legal public holidays).  (Doc. # 70-9 ¶ 14; Doc. # 73-1 at pp. 3-5).   BANA received Plaintiffs' February 14, 2012 letter on February 20, 2012, acknowledged the letter on February 29, 2012 (10 business days after receipt, excluding legal public holidays), and responded to the letter the following day, on March 1, 2012. (Doc. # 70-9 ¶ 15; Doc. # 73-2 pp. 7-11).   Thus, the undisputed record evidence establishes that BANA timely acknowledged and responded to Plaintiffs' requests for information even though they did not constitute QWRs.

Further, BANA complied with any obligation to provide information concerning the servicing of the Loan by providing Plaintiffs with the payment history for the Loan, which detailed the payments received, tax and insurance payments disbursed, and charges assessed and paid.  (Doc. # 73-1 at pp. 3-34).   BANA also provided (1) information concerning the lender-placed insurance policy obtained by BANA; (2) copies of Plaintiffs' Note and Mortgage; and (3) an appraisal report, among other information.  (Doc. # 73-2 at pp. 8-55).  Thus, Plaintiffs have failed to establish that BANA violated any obligation under RESPA.

### 3.    Plaintiffs Have Not Shown Actual Damage Under RESPA.

Plaintiffs' RESPA claim fails for the additional reason that they have not shown any actual damage resulting from the alleged violation.  The Eleventh Circuit has held that "to state a claim under RESPA, a plaintiff must allege facts showing he suffered actual damages  … ."  *Tallent v. BAC Home Loans*, 2013 WL 2249107 at *5 (N.D. Ala. 2013).  "Additionally, district courts in this circuit have held that a plaintiff must also allege a causal link between the claimed damages and the defendant's alleged RESPA violation."  *Id.*

The Eleventh Circuit has addressed the availability damages under RESPA as follows:

Construing the term "actual damages" broadly, and based on the interpretations of "actual damages" in other consumer-protection statutes that are remedial in

nature, plaintiffs arguably may recover for non-pecuniary damages, such as emotional distress and pain and suffering, under RESPA. *See, e.g., Banai v. Sec'y U.S. Dep't of Hous. & Urban Dev. ex rel. Times*, 102 F.3d 1203, 1207 (11th Cir. 1997) (the Fair Housing Act allowance for "actual damages" includes anger, embarrassment, and emotional distress). Nevertheless, the [plaintiffs] must present specific evidence to establish a causal link between the financing institution's violation and their injuries. *See Turner v. Beneficial Corp*., 242 F.3d 1023, 1027-28 (11th Cir. 2001) (en banc) (requiring a causal link for TILA claims). In some circumstances, we have held that a plaintiff's testimony alone could support an award of compensatory damages for emotional distress. *Akouri v. Fla. Dep't of Transp.*, 408 F.3d 1338, 1345 (11th Cir. 2005) (concerning constitutional violations). However, "the testimony must establish that the plaintiff suffered demonstrable emotional distress, which must be sufficiently articulated; neither conclusory statements that the plaintiff suffered emotional distress nor the mere fact that a ... violation occurred supports an award for compensatory damages." *Id.* (quotation omitted).

*McLean v. GMAC Mortg. Corp.*, 398 Fed.Appx. 467, 471 (11th Cir. 2010).

Here, Mr. Davis merely testified that BANA's alleged untimely responses to his letters caused him "stress" and "duress." (Doc. # 73-8 at pp. 119:2-3). However, this testimony does not constitute the "specific evidence" necessary to establish a causal link between the financing institution's RESPA violation and Mr. Davis's injuries ─ particularly in light of all of the other, more significant stressors in the Davis's lives, such as their long-term failure or inability to make mortgage payments on their home, Mr. Davis's lack of steady employment, the Davis's three foreclosures on other properties. (*See generally* Docs. # 75-3 and 75-8).

Plaintiffs' also claim that over $21,000 in foreclosure fees were unjustly added to their account. First, the record evidence shows that these charges were authorized according to the express terms of the Note and Mortgage. (Doc. # 70-9 at ¶ 17). Plaintiffs have failed to present record evidence to the contrary. Second, and again, Plaintiffs have failed to establish a causal relationship between these fees and the alleged REPSA violations.

Therefore, for all of these reasons, Defendants are entitled to summary judgment on Plaintiffs' RESPA claim.

**B.     Counts Two, Three and Six – Plaintiffs' Fraud and Deceit Claims Fail**

Count Two of Plaintiffs' First Amended Complaint alleges BANA "deceived" Plaintiffs by purporting to review Plaintiffs' loan for a modification after the mortgage/note had been sold. Count Three alleges that SPS has "been misleading" Plaintiffs by "dual tracking" their account by purporting to review Plaintiffs' loan for modification while continuing foreclosure proceedings. Count Six alleges that Defendants were involved in a fraudulent or deceptive loan modification program. It appears that Plaintiffs are alleging fraud and deceit, but none of these counts state a valid claim, much less a claim supported by substantial evidence.

**1.     Plaintiffs Have Failed to Establish the Elements of Fraud**

The elements of fraud are:

> (1) a false representation (2) of a material existing fact (3) relied upon by the plaintiff (4) who was damaged as a proximate result of the misrepresentation. *Earnest v. Pritchett–Moore, Inc.*, 401 So. 2d 752 (Ala. 1981). If fraud is based upon a promise to perform or abstain from performing in the future, two additional elements must be proved: (1) the defendant's intention, at the time of the alleged misrepresentation, not to do the act promised, coupled with (2) an intent to deceive. *Clanton v. Bains Oil Co.*, 417 So. 2d 149 (Ala. 1982).

*Coastal Concrete Co. v. Patterson*, 503 So. 2d 824, 826 (Ala. 1987); *see also* § 6-5-101, Ala.Code 1975 (stating the elements of fraud). "In promissory fraud, the material existing fact that is misrepresented is the defendant's state of mind, when the defendant represents that he intends to perform some act although he does not in fact intend to perform it." *Spring Hill Lighting & Supply Co. v. Square D Co*., 662 So. 2d 1141, 1149 (Ala. 1995).

Plaintiffs have admitted under oath that they were not promised a loan modification:

> Q.     And nobody [at BANA] promised you that your loan would be modified, did they?
>
> A.     No.  [ . . . ]

(Doc. # 73-8 at p. 99:14-16).  Thus, Plaintiffs have failed to establish the first element of their

fraud claim.

Moreover, the undisputed record evidence shows that Defendants made repeated attempts to review Plaintiffs for a loan modification. (Doc. # 70-9 ¶ 12). However, Plaintiffs were either unwilling or unable to provide the documents required for the review. (Doc. # 70-9 ¶ 12). When asked whether Plaintiffs submitted everything BANA requested to review Plaintiffs for a loan modification, Mr. Davis testified, "I don't know." (Doc. # 73-8 at p. 95:10). In fact, Plaintiffs did not produce all of the financial documents requested. (Doc. # 70-9 ¶ 12; Doc. # 75-1 ¶ 14; Doc. # 75-2 at pp. 23-25; Doc. # 75-3 at pp. 151-52).

Even if there had been a misrepresentation of a material fact (and, to be clear, there was not one), Plaintiffs have also failed to show how they have been damaged. To the contrary, the record establishes that Plaintiffs continued to enjoy possession of a home on which they are over $130,000 in arrears and have not remitted a mortgage payment since 2010.

Because Plaintiffs have failed to establish either the first or fourth element of their fraud claim, Defendants are entitled to summary judgment on that claim.

### 2.     Plaintiffs Failed to Establish the Elements of Their Deceit Claim

The definition of deceit, set forth in Alabama Code § 6-5-104, is:

(a) One who willfully deceives another with intent to induce him to alter his position to his injury or risk is liable for any damage which he thereby suffers.

(b) A deceit within the meaning of this section is either:

(1) The suggestion as a fact of that which is not true by one who does not believe it to be true;

(2) The assertion as a fact of that which is not true by one who has no reasonable ground for believing it to be true;

(3) The suppression of a fact by one who is bound to disclose it or who gives information of other facts which are likely to mislead for want of communication of that fact; or

(4) A promise made without any intention of performing it.

Ala. Code § 6-5-104.

Plaintiffs' deceit claim appears to be based on Plaintiffs' assertion that Defendants led them to believe that Defendants would review them for a loan modification, but instead blocked Plaintiffs' efforts in this regard.  Plaintiffs also allege that Defendants undertook simultaneous foreclosure activities.  Again, Plaintiffs admitted that no one promised them their loan would be modified, and the facts show that Defendants in fact attempted to review Plaintiffs' loan for a modification.  The fact that the servicing of Plaintiffs' loan transferred from BANA to SPS while Plaintiffs were attempting to secure a loan modification is not evidence of fraud or conspiracy.  Plaintiffs' loan was transferred to SPS during the HAMP loan modification review, but the undisputed evidence demonstrates that BANA continued to aid in the modification efforts by, among other things, continuing to forward financial documents received by Plaintiffs to SPS for its review.  (Doc. # 70-9 ¶ 16).  The HAMP loan modification review was actually accomplished, but Plaintiffs did not qualify.  (Doc. # 75-1 ¶ 4; Doc. # 75-1 at pp. 39-45).  Thereafter, SPS offered to review Plaintiffs' loan for a modification pursuant to SPS's proprietary loan modification program.   (Doc. # 71-1 ¶ 10; Doc. # 75-2 at pp. 3-13).  However, Plaintiffs did not produce all of the required financial documents.  (Doc. # 70-9 ¶ 12; Doc. # 73-8 at p. 95:10).

Plaintiffs have also failed to produce any evidence supporting their allegation of "dual tracking" or any evidence of untrue statements by Defendants.  The following exchanges during the course of Mr. Davis's deposition are illustrative:

A.      You asked me about SPS, what is my claims against SPS.

Q.      Right.

A.      Look at the lawsuit.

Q.      You can't tell me in your own words what you are claiming?

A.      Look at the lawsuit.

Q.      I don't want to look at the lawsuit, I want you to tell me.

A.      Look at the lawsuit.  It's not right.  I took time to put that together and the things I had to look at.

…

Q.      Other than saying that, saying look at your lawsuit, you are not going to tell me why you are suing them?

A.      That is it.  It's in the lawsuit.  I don't know how much plainer I can put it like that.

Q.      Well, apparently you can't describe it.

A.      Conspiracy to defraud, deception.

Q.      How so?

A.      Look at the lawsuit on there.

Q.      Who misrepresented something to you?

A.      That's what I am telling you.

Q.      It doesn't say.

A.      Just look at the lawsuit.

Q.      It doesn't say, Mr. Davis.  Who made a misrepresentation to you?

A.      The representative, SPS.  Just look at the lawsuit.  I'm not going to engage in something like this with you when the lawsuit is in front of you that you can actually look at.

…

Q.      How did SPS fraudulently block your effort to obtain a legitimate home modification review?

A.      How did they do what now?

Q.      Fraudulently block your effort to obtain a legitimate home modification review.

A.      I will have to look at my notes again on that, but I'm not going to answer and try the case right here at the deposition.  I'm only going to answer questions.  Like I say, you asked the courts to be dismissed, that SPS be dismissed based on what you felt was grounds to be dismissed.  I asked them to stay there based on the grounds that I felt that they should be there.

(Doc. # 75-3 at pp. 158-162.

Q.      You also state that SPS has been dual tracking your home [loan].  What does that mean?

A.      Dual tracking is when they tell you that they are reviewing you for a loan modification and nothing is going on.  But yet on the other department, unbeknown to you, that they have collection activity and foreclosure activity.

Q.      Does SPS have any foreclosure activity going on against you since you named them in the lawsuit or before?

A.      I think they may have had one in that paperwork.  You will get a chance to look in there.  There is like several different foreclosure dates, and I think one was with SPS just to give you a heads up so you won't say that SPS has never done that.

Q.      There is a stack [of documents], if you want to go look for it.

A.      That's what I am saying.  You will get a chance to look at it and see.  It's in there.  It's definitely in there, several of them.  The two that I put on my response to you was just two of them.

Q.      I would like you to find those in your stack [of reproduced documents].

A.      No, no. They are in your stack [of reproduced documents], that right there, because those are the same thing.

Q.      Could you take a break and just look for them?

A.      No. I'm saying they are in your stack [of reproduced documents] there.

Q.      I know. Can you find them for me?

A.      Why would I want to do that?

Q.      Because I want to put them in the record.

A.      Then you can put them in the record.  They are in there.  I'm not going to do that.

Q.      You are not going to do that?

A.      I have sent this right there to you, and they are in there.

Q.      You are not going to go through your document production and identify a document?

A.      If you go through it, I will identify it.

Mr. Collins:  Okay, Let's go off the record

(Discussion off the record)

Q.      (By Mr. Collins) For the record, I have reviewed over a thousand pages of documents, and there is not any letters or correspondence from SPS accelerating the mortgage or threatening to foreclose.  And, Mr. Davis, if you would like to go through those documents, you are more than welcome to do so.

(Doc. # 75-3 at pp. 174-176) (emphasis added).

Because Plaintiffs have failed to present evidence establishing the elements of their deceit claim, Defendants are entitled to summary judgment on that claim.

### 3.      Plaintiffs Failed to Establish a Fraudulent/Deceptive Practices Claim

Count Six of Plaintiffs' First Amended Complaint is, frankly, unintelligible.  It appears to assert that Defendants engaged in a fraudulent loan modification program and that the holders and servicers of the note are not entitled to payment on the note/mortgage and do not have the authority to enforce the note.  As discussed above, Defendants, in fact, considered Plaintiffs for loan modification.  Plaintiffs' HAMP modification was denied, but Defendants continued to attempt a loan modification.   Plaintiffs thereafter failed to provide all the necessary documentation for that review.  Simply put, Plaintiffs have failed to present any record evidence

20

of fraudulent or misleading actions by Defendants.  Further, as discussed in detail below, there is no merit to Plaintiffs' argument that the note and/or mortgage are unenforceable.  Therefore, Defendants are entitled to summary judgment on Count Six.

### C.      Count Four – Plaintiffs' Mortgage is Valid and Enforceable

In Count Four of their First Amended Complaint, Plaintiffs dispute the validity of the mortgage and note at issue relating to their home at 919 Highland Lakes Lane.  Plaintiffs argue that the mortgage is invalid because Mr. Davis signed it a week or two after the closing and because Mrs. Davis did not sign it.  (Doc. # 73-4 at p. 6; Doc. # 70-3; and Doc. # 73-6 at p. 13). Mr. Davis testified as follows:

> Q.      Ok. So you borrowed the money at closing, and you didn't sign a note at the closing?
>
> A.      I did not sign this at closing.  No, I did not.  I did not sign a note at closing.
>
> Q.      Did you sign it after closing?
>
> A.      I think I signed it after closing, maybe a week or two weeks or something like that.

Exhibit H, p. 46:9-15.  Mr. Davis admits that his intent at closing was to borrow money to pay for his house and he intended to sign the note and the mortgage in relation to that transaction. (Doc. # 75-3 at pp. 48-52).

Plaintiffs' argument is based on Alabama's homestead exemption, but it is misplaced. "The requirement of a spouse's signature on a conveyance [of a homestead] is intended to protect that spouse from a conveyance of the homeplace without his or her consent." *Sims v. Cox*, 611 So. 2d 339, 341 (Ala. 1992) (citing *Gowens v. Goss*, 561 So. 2d 519 (Ala. 1990) and *Leonard v. Whitman*, 249 Ala. 205, 30 So. 2d 241 (1947)).  Here, Mr. Davis did not convey a homestead without Mrs. Davis's consent.  He purchased one for their mutual use and enjoyment.

Further, the mortgage at issue here is a purchase-money mortgage.  Pursuant to Alabama law, a purchase-money mortgage is "[a] mortgage on land executed to secure the purchase money by a purchaser of the land executed contemporaneously with the acquisition of the legal title thereto, *or afterward*, but as a part of the same transaction."  *Martin v. First Nat. Bank of Opelika*, 184 So. 2d 815, 818-19 (Ala. 1966) (emphasis added).  As confirmed in the "HUD" statement, the monies procured via the Note and Mortgage were used to purchase 919 Highland Lakes Lane, and thus the Mortgage constitutes a purchase-money mortgage.  (Doc. # 73-7).

It is well settled under Alabama law that a homestead claim cannot prevail against a lien securing purchase money.  *See* Ala.Code § 6-10-4 (1975) ("The provisions of this article shall not, however, be so construed as to prevent any lien attaching to the homestead in favor of any laborer, merchant, or materialman for work and labor done or for materials furnished, or in favor of any vendor for unpaid purchase money…."); *see also Cates v. White*, 252 Ala. 422, 423, 41 So. 2d 401, 402 (1949) ("[A] homestead claim cannot prevail against a purchase-money mortgage given contemporaneously with the purchase."); *Coon v. Henderson*, 199 So. 704, 706 (Ala. 1940) ("It is well settled in this jurisdiction that a vendor's lien for unpaid purchase money is superior to the vendee's claim of homestead exemption, and that the homestead claim cannot prevail against a purchase-money mortgage, or contract, executed contemporaneously with the purchase.").

In this case, Plaintiffs used the mortgage to secure loan proceeds which were borrowed to purchase their new home at 919 Highland Lakes Lane.  Accordingly, the Mortgage is a purchase-money mortgage and takes priority over any homestead interest Mrs. Davis might have in the property.  Indeed, Mrs. Davis's homestead interest is subordinate to the Mortgage regardless of whether she joined in its execution or not.

In *Camden Fire Ins. Ass'n v. Landrum*, 156 So. 832, 833 (Ala. 1934), the wife claimed a homestead exemption and disputed signing a purchase-money mortgage purporting to contain her signature.  As the court noted, even taking Plaintiffs' version that she did not sign the mortgage as true, "a purchase-money mortgage given by the husband alone is good against any homestead or dower rights of the wife."  *Camden Fire Ins. Ass'n*, 156 So. at 833; *see also King v. Chandler*, 105 So. 184, 185 (Ala. 1925) ("[A] purchase-money mortgage contemporaneously given by the husband purchaser is superior to the wife's right of dower.").  Therefore, Mrs. Davis's claim related to the Mortgage's execution and/or her homestead interest all fail as a matter of law.

Mr. Davis's argument that he did not sign the mortgage and the note "contemporaneously" with the closing is also irrelevant.  It has long been established in this state that as long as the acquisition of title and execution of a mortgage were part of the same transaction, it does not matter that the mortgage is signed after closing.  *See Martin*, 184 So. 2d at 818-19 ("A mortgage on land executed to secure the purchase money by a purchaser of the land executed contemporaneously with the acquisition of the legal title thereto, *or afterward*, but as a part of the same transaction, is a purchase-money mortgage."); *Sunshine Bank of Ft. Walton Beach v. Smith*, 631 So. 2d 965, 967 (Ala. 1994) ("[T]he execution of the [deed and the mortgage] need not occur 'at the same moment, or even on the same day, provided the execution of the two instruments constitute[s] part of one continuous transaction and was so intended [by the parties involved].'") (quoting 59 C.J.S. Mortgages § 231).

Of course, the true test for determining whether a mortgage is a purchase-money mortgage is not the time of its execution but "whether the proceeds are to be used to apply on the purchase price."  *Sunshine Bank of Ft. Walton Beach*, 631 So. 2d at 967.  The Alabama Supreme

Court has found that a mortgage executed as much as eleven (11) months after closing was still part of the "same transaction" as the closing and therefore constituted a purchase-money mortgage.  *See Sunshine Bank of Ft. Walton Beach*, 631 So. 2d at 967.  Therefore, Defendants are entitled to summary judgment on Plaintiffs' claim that the mortgage at issue is invalid.

### D.    Plaintiffs Have Presented No Evidence In Support of Their Claim Asserted In Count Five

Count Five of Plaintiffs' First Amended Complaint alleges, in its entirety as follows:

> Forensic evidence of Bank of America's records indicates that Plaintiffs' payments were not applied appropriately, unauthorized charges had been added and the note and mortgage in question were not properly executed and transferred to the various servicing agents and/or mortgagors.

(Doc. # 35 at ¶ 23).

In support of its Motion for Summary Judgment, BANA has presented undisputed Rule 56 record evidence that establishes that Plaintiffs' payments (or, that is to say, those payments that were actually made) were, at all times, properly credited according to the terms of the Note and Mortgage, and that any fees and/or late charges that were incurred were authorized according to the terms of the Note and Mortgage.  (Doc. # 70-9 ¶ 17).  In contrast, Plaintiffs have presented no evidence whatsoever in support of their conclusory allegations that payments were not properly applied.  The alleged "forensic evidence" is simply nowhere to be found in the record. Therefore, Defendants are entitled to summary judgment on this claim.

### E.    Count Seven – Plaintiffs Have Not Shown They are Entitled to an Injunction

In Count Seven, Plaintiffs appear to request an injunction against unspecified conduct by Defendants.  (Doc. # 35 ¶¶ 30-31).  An injunction is a remedy, not a cause of action. "There is no such thing as a suit for a traditional injunction in the abstract. For a traditional injunction to be even theoretically available, a plaintiff must be able to articulate a basis for relief that would

withstand scrutiny under Fed.R.Civ.P. 12(b)(6)." *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1127 (11th Cir. 2005) (citing *Klay v. United Healthgroup, Inc.*, 376 F.3d 1092, 1097 (11th Cir. 2004)).   Injunctive relief is not properly pled as a separate cause of action, but is available only as a part of the relief granted if a plaintiff prevails on a substantive cause of action.   *Klay,* 376 F.3d at 1097.   Therefore, this claim necessarily fails.

But even if a separate cause of action for an injunction stated a claim for relief (and, to be clear, it does not), in this case, Plaintiffs are not entitled to the requested injunctive relief.   The first prerequisite a plaintiff must establish to obtain an injunction is a substantial likelihood of success on the merits.   *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002).   Although Plaintiffs have pled other substantive causes of action in their First Amended Complaint, as discussed above, they cannot show they have a substantial likelihood of success on the merits of any of their claims because Defendants are entitled to summary judgment on all of those claims.

## IV.   Conclusion

For the foregoing reasons, Defendants are entitled to judgment as a matter of law on all of the claims asserted in Plaintiffs' First Amended Complaint and Defendants' Motions for Summary Judgment are due to be granted.   A separate order will be entered.

**DONE** and **ORDERED** this October 9, 2014.

_____
**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE